EASTERN DIST.
June, 1835.

POULTNEY'S HEIRS* vs. BARRETT ET AL.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

8L 441
105 292

Where a corporation alienated a lot of ground subject to a ground rent of six per cent. per annum, on one thousand seven hundred and twenty-five dollars, payable quarterly, with condition that if two or more quarters remained unpaid, the alienor may enter and take possession : *Held*, that when the premises were transferred to a third possessor, who died without paying the arrearages of rent, a sale by the syndics of his creditors provoked by the corporation, divested his title thereto, so that his heirs at law cannot recover.

When the right of entry stipulated for by the corporation became absolute, by arrearages of rent accruing, and non-compliance with the conditions, the purchasers and vendees are mere tenants at will, as the corporation had the right to enter at any time.

This is an action of revendication. Suit was instituted the 11th of February, 1833, by Mathilde and Emilie Poultney, minors, above the age of twelve years, assisted by their mother, Emilie Toutan Beauregard, widow Poultney, as natural tutrix, and J. R. Grymes, as under tutor. They claim, as heirs of the late John Poultney, their deceased father, a lot of ground on Canal-street, in New-Orleans, now in the possession of the defendant, which they allege was acquired by their ancestor, during marriage, under a notarial act of sale from B. P. Porter, and the widow of A. W. Depeyster, in her own behalf and as tutrix of her minor son, dated the 5th May, 1818.

Barrett answered, pleaded the general issue, and called William Deacon, his vendor, in warranty, and also John Hagan, who was bound to him for one-half of the lot.

* This and the two preceding cases of *Poultney's Heirs* vs. *Cecil's Executor, ante* 321, and *same Plaintiffs* vs. *Ogden, ante* 428, were all tried at the same time, and the facts and arguments applicable to the plaintiffs' claim and title, *are the same in all*, and are *so considered and reported.*

56

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

1. Deacon answered, denying the plaintiffs' right to sue or to the property claimed, and that they have never legally accepted the succession of their father.

2. Poultney never legally acquired the property, and his heirs can have no title.

3. That the lot in question was sold by the corporation in 1812, subject to a ground rent to Poultney's vendors, which remained unpaid for a series of years until the 21st December, 1822, when George Lloyd, who had been put in possession of it with the other property of Poultney's estate, as sole syndic of the creditors, caused it to be sold for the rent then due on it, when he (Deacon) became the purchaser for a valuable consideration.

4. He calls the corporation of New-Orleans in warranty.

The evidence showed, that the act of sale from the corporation of New-Orleans to Porter and Depeyster, dated the 19th of May, 1812, of the lot in question, contained a clause "that if the grantee or his assigns, should petition for a respite or cession of property, they should forfeit all their title to the lot," &c. This made part of the property in Poultney's schedule when he applied for and obtained his respite.

On the 21st of December, 1822, on motion of L. Moreau Lislet, Esq., attorney for the corporation of New-Orleans, it was ordered by the District Court, that the syndics of John Poultney do sell the lot acquired from the corporation by the said Poultney, to satisfy the rent due "to said corporation, after fifteen days advertisement from the service of this order."

The lot was sold accordingly, subject to a ground rent of six per cent. on one thousand seven hundred and twenty-five dollars, due to the corporation, and William Deacon now called in warranty, became the purchaser for the sum of two thousand seven hundred dollars. George Lloyd, as sole syndic of Poultney's creditors, passed an act of sale to the purchaser before Michel de Armas, notary public, the 18th January, 1823. This is the title on which the defendants rely.

The facts on which the plaintiffs rest their claim to recover as heirs and in right of John Poultney, their deceased

ancestor, are fully stated in the report of the case of
*Poultney's heirs* vs. *Cecil's executor, ante* 321.

The district judge who presided at the trial, in delivering his judgment, after stating the facts of the case, proceeds: On the previous argument of this cause the plaintiffs insisted on the following points:

1. That the defendant having given in evidence the title under and through which John Poultney held and owned the property, he cannot now question it.

2. That the District Court was without jurisdiction of the case of Poultney's estate, in appointing syndics, ordering the sale of the property, &c., and that the sales made in pursuance thereof are null and void.

3. If the District Court had jurisdiction, its proceedings in this case did not divest the minors Poultney of their rights, who were not parties thereto. The estate of Poultney devolved immediately at his death on his heirs, and nothing has been done legally to divest it; minors are especially protected by our laws; these proceedings were entirely *ex parte,* and the succession was actually opened in the Probate Court, where the creditors should have presented, liquidated and settled their claims.

4. That with regard to the property in question, the corporation never exercised its right of entry for the *non*-payment of rent or forfeiture, but pursued Poultney's estate, as if he was a common debtor, and had the property sold for their common benefit, thereby confirming the sale; that the rents have now all been paid, and the receipt of the corporation is a waiver of any claim to forfeiture.

On the part of the defendent and warrantors, it was contended.

1. That the plaintiffs must recover on the strength of their own title, and for that purpose must show a perfect one; that the title from Porter and Depeyster is imperfect, being in part minors' property conveyed by the tutrix without the legal formalities; and that Poultney never signed the act which was necessary, as it contained an assumption of covenants by the vendee.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

2. That the act of sale by the corporation did not vest title in the vendee; that Poultney's title was forfeited for the non-payment of the rent. *Clark's heirs* vs. *Christ Church*, 4 *Louisiana Reports*, 286.

3. The heirs have no rights; Poultney's succession was insolvent; his widow renounced and declined accepting for the minor heirs, or taking any part in its administration; and had she accepted for them with benefit of inventory, they would only have been entitled to the residuum of an insolvent estate after payment of its debts.

4. That under the law, as it stood at the time Poultney's succession was opened, until an acceptance or renunciation, the inheritance was considered as a fictitious being, representing in every respect the deceased, who was owner of the estate. *Civil Code of* 1808, *article* 72, *page* 162.

5. That this was a peculiar clause, not in the French Code, or the present Louisiana Code; and that this fictitious being could be pursued in the District Court, and the creditors could only proceed against the estate, as for a forced surrender. 7 *Febrero, ad., No.* 18, *part* 19, 123.

6. That the creditors had a right to the estate, and were not required to give it up even to the beneficiary heirs, until the debts were paid; that the syndics actually did apply to the Probate Court, and had its administration decreed to them by that tribunal; and that the heirs were not entitled to the benefit of the respite granted their ancestor. 7 *Febrero, ad.*, 123.

7. The jurisdiction of the District Court extended to the trial of all civil cases. 2 *Martin's Digest*, 188. And that the powers of the Probate Court, under the act of 1804, 3 *Martin's Digest*, 472, *sec.* 2, only extended to the proof of wills, appointing curators, making inventories, &c.; that the Superior Court which preceded the District Court, had universal jurisdiction, &c., which could not be restricted by the Civil Code of 1808, as the first was established by act of congress, the latter by the territorial legislature. The powers of the late Superior Court remained undisturbed until 1812, when they were given to the District Court.

8. That the act of the 18th of March, 1820, relative to the Probate Court, was promulgated after the proceedings of the creditors of Poultney's estate in the District Court, had commenced, and could not affect them ; and this act did not confer exclusive jurisdiction on the Probate Court; that was not done until the adoption of the Code of Practice in 1825.

9. The proceedings by the creditors against Poultney's estate, commenced in the District Court, in 1820, while the decision in the case of Abat *vs.* Songy's estate, made in 1819, was in full vigor, and was not liable to the want of jurisdiction.

10. That Poultney's estate, at his death, was in a peculiar situation ; no one would give the security and administer it in the Probate Court, and was not expressly provided for; and was, therefore, within the equity powers of the District Court, as provided for by the *Civil Code, page* 6, *article* 21.

11. That when the property of a succession is sold to pay debts, it is not sufficient to show that formalities were complied with. Lesion must be shown. 6 *Febrero, ad.,* 499. 2 *Moreau & Carleton's Partidas,* 1153, 1156. 7 *Peters,* 469. In the latter case, the Supreme Court of the United States, held, "that where sales were destitute of formalities, but good in substance, they will be sustained; that infants in that case, were held bound to take notice of public acts, and were bound by them.

In deciding on this case, which is a suit to annul judicial proceedings for defects of form, in not pursuing the required formalities in disposing of an intestate insolvent estate, it has given rise to some general reflections.

Having received my legal education in a state where great strictness of practice was observed, after a very short acquaintance with the laws of Louisiana, it struck me that comparing the multiplied requisitions of the civil and statute laws with the manner in which legal proceedings were conducted, very few titles based on judicial constructions had the strict legal requisites for validity. Scarcely a suit was conducted with legal regularity: the clerks and sheriffs and frequently the judges were taken from the ordinary pursuits

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
*vs.*
BARRETT ET AL.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

of life: many of the lawyers had not received a regular professional education; and the greatest irregularity arising from good faith and a loose mode of doing business, existed in conducting business in every department of the state administration. There has been great improvement, but much irregularity exists and always will exist.

When I first came to preside in this court, in 1832, it was matter of astonishment to clerks, sheriffs and attorneys, that I required the return of service of citation to be read and to be conformable to law, before judgment by default was granted; and it was found that when the service was not personal, not one return of service of citation was regular and legal, and ought to have been received as the foundation for a judgment by default; yet, on such returns, they had been granted and confirmed; and, on examination, it was always found that service had been properly made, it was only the return that was deficient: the substance had been complied with, the form had been omitted.

The same change has taken place in commerce. In the good old Spanish times, notes were not asked nor given; a verbal promise was relied on. Now, it is nothing but notarial acts, notes, endorsements and protests. Let us not, therefore, judge of the past by the present, or apply rules now adopted, in judging of past proceedings: let us, if we can, put on the spirit of good faith, in judging of past proceedings, and not apply Codes of Practice, new notions and self-conceit, to the acts of our predecessors, but decide on them with great allowance for the changes that have taken place even in a very short period of time, and regard more, if there be, substance than form.

It may be observed, that in every state in the Union it has been found necessary to modify, and even change what were considered fundamental principles of the law adopted; and that, not by statute only, but also by decisions of the courts and general practice. This has been done to a great extent in the state of New-York, which has most closely followed the system of English law. Our peculiar situation and state of society imperiously demand those modifications.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

Let it also be observed, that the wonderful changes which exist between the present mode of practice, and even of the law in England, and what prevailed three centuries ago, were not made by statute, but were suggested and adopted by convenience and experience. They have produced, in many respects, a revolution in the law.

It would be affectation and pedantry if I were to scan the various and important differences in ancient and modern .practice in England, which an education at the feet of a Gamaliel in the law, in the city of New-York, made me familiar. My mind is, I believe, imbued with a love of technicality, though I like to see good pleading, from its close relation to strict logic.

I have been struck with the spirit of literal interpretation and rigid technicality which prevails with persons entrusted with the execution and interpretation of laws ; such as directors of companies, &c.; while lawyers, judges and men of generalizing mind, look more to .the object, purpose, spirit and intention of the law; and, perhaps, not always sufficiently so.

The necessity of a free presumption and liberal interpretation, to protect the validity of judicial proceedings, has been felt by our own court of last resort.  It cannot be denied that the decisions in the cases of Barabino vs. Brashears, and Lafon vs. Lewis, are a free departure from the strict principles of law, applicable to the subject of proceeding ; but a departure called for, justified and rendered necessary by the mode in which judicial proceedings have been conducted; ,by the manner in which executive, and even judicial offices had been filled: the first by persons who had no previous acquaintance with the duties of the offices they were called to fill; and the last, by persons partially acquainted with the system they were called to administer, and ignorant of its practical rules and law.   In these respects, we may yet be called a colony of France and Spain.

What may be called the law of practice, or modes of conducting business must, after all, depend on the existing modes which courts and practitioners find convenient, choose

EASTERN DIST.
*June, 1835.*

POULTNEY'S
HEIRS
*vs.*
BARRETT ET AL.

to adopt, or accidentally fall into; and these will control the most positive statutes.

Every state in the Union, with the exception of Louisiana, adopts the Common Law of England, and yet every state in the Union has adopted a local practice, which differs from the practice in England, and every one from each other, even in those matters not regulated by statute. There is, therefore, a law of practice resting in practice in every state in the Union, and that law of practice varies from time to time, according to circumstances.

In the early stages of colonization, it is loose, resting on good faith and general convenience. As population increases and transactions multiply, and good faith vanishes, it becomes more rigid and scrutinizing, and it cannot be called a prediction to say, that fifteen years hence our successors will find as great irregularities, anomalies and apparent illegalities in our present modes of conducting business or practice, as we affect to find in the modes of doing business of our predecessors, fifteen years ago.

The spirit of these remarks is exemplified in a decision in the case of Leasdale *vs.* the administrators of Branton, 2 *Haywood's N. C. Reports,* 377.

To a *scire facias* on a judgment, *nul tiel* record was pleaded: when produced, the record showed the verdict, but no judgment had been regularly entered. The court decided, "we must presume according to the loose practice of this state, that there was a judgment; and, therefore, we must say there is such a record:" thus substituting a *presumption* against a *fact.*

This decision was made in 1805, in the Circuit Court of the United States for North Carolina; the circuit in which Chief Justice Marshall presided.

If the books were searched, numerous instances of the necessity of similar presumptions might be found, and that it has frequently been necessary to look to the acts, intentions, circumstances and understanding of parties, and not to the manner in which they were carried into execution or the very defective forms in which they appear recorded.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

The necessity of viewing matters in this light and deciding in conformity with these principles, is greatly increased in a country and in a city such as ours, which, undergoing such constant changes, immense improvements and fluctuations in value ; where a city expands itself with the rapidity of a change of youth to manhood.

If the value of property remained stationary, we should see less of this eagerness to upset titles for defects of forms ; and, in point of justice, regard should be had to the value of the property at the time of the sale. If the full value of the property at the time of the sale has been paid, and the money applied to pay debts, it is all that ought to be required.

To apply ourselves to the case before us, the objection made by the defendants' counsel to plaintiffs' title, in consequence of Poultney not having signed the act of purchase from Porter and Mrs. Depeyster, the want of production of the decree referred to, &c., might have been urged inasmuch as in such an act of sale, the vendee is to bind himself to various obligations and covenants towards the corporation, and as a plaintiff must recover on the strength of his own title, if the defendant had confined himself to the general denial ; but, as Deacon the last person called in warranty, has set up a title derived under and through Poultney, he cannot be allowed to question Poultney's title.

It is clear to me that the acts, pleadings, admissions, &c., of a person called in warranty are binding on those who call him in, unless collusion be shown between him and the plaintiff in the suit.

With regard to the position advanced by defendants' counsel, that minors cannot recover against sales of their property, unless lesion be shown, the authorities cited do not expressly support a principle which would apply to the present case : they apply to contracts made by the minor or his representative. An analogy of reasoning would apply on the assumption, that the widow Poultney is to be considered in truth and substance, as a party to the suit of insolvency, as well by having had full notice, as by having executed the decree appointing syndics, by surrendering up the property to

57

EASTERN .DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.
be administered by the syndics, and joining them after their appointment in powers of attorney to recover the succession and estate of Poultney to be administered by them. If, therefore, not lesion only in its legal sense could be repelled, but if it could be shown that the property brought a fair, full price, according to the value of property at the time, or if it did not, and the complement of the price according to its value at that time was now made up, all the purposes of justice and equity, and of law would be answered.

For, as the estate is clearly shown to have been insolvent, and there was an absolute necessity to sell the whole of it to pay the debts, and even then, there would have been deficiency, justice and law would be answered if the estate was accounted for, according to its then value.

It exhibits a glaring departure from justice, that the children of an insolvent should claim an estate when the debts are unpaid, or for aught that appears, the estate was sold in a *bonâ fide* manner for the payment of those debts, and brought its value, which was insufficient for that purpose: stripped of artificial reasoning, I consider the case of Livingston *vs.* Moore, 7 *Peters,* as in truth decided on these principles.

Upon the whole matter, I come to the following conclusions:

1. That the widow Poultney was natural tutrix of her children, by virtue of her relation to them, and the oath is not necessary to make her such, or her acts binding on them; that if a parent assumes to act as tutor without being sworn, and the objection is taken, the objection would be sustained as a means of enforcing obedience to the law, but that the natural tutor is such by virtue of relationship to the minor, and his acts and conduct are binding, without his having taken the oath. This conclusion is reasonable and just, and is strongly supported by rules of law; for if the mother declines the tutorship, and of course is not sworn, still she remains tutrix till another is appointed. *Civil Code,* 271. That whatever is done actively or passively by the tutor so far as he may by law do or suffer as tutor,

is as binding on the minor as it would be on the tutor himself, if it were his own affair.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

2. That at the period when these proceedings were had, the jurisdiction of the different courts of the state, was not well settled or defined; nor do the laws, conferring jurisdiction, contain words of privation and exclusion. That with regard to these matters, existing practice and the acts of judges, courts, sheriffs, clerks, lawyers, &c., must be considered as the best, being contemporaneous exposition, or that common error, more especially on a matter of practice, must make law.

That it is of dangerous consequence, to test former procedings by present laws, opinions and notions.

That where a loose practice has existed, courts must sustain it as law by every presumption.

That assuming the utter insolvency of Poultney's estate, its magnitude, and the magnitude of the debts, and the impossibility of any one giving adequate security, and the widow having renounced, and no one claiming any curatorship, &c., it was an omitted case in the law, and the courts were bound to apply a remedy under the discretionary power, conferred in express terms, by article 21, Code of 1808, viz: "In civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is made to natural law and reason, or received usages where positive law is silent."

That the article applies not only to the mode of deciding, but also to the remedies, where none are provided for the circumstances of the parties.

That even the provision contained in article 1178 of La. Code, that the judge shall administer small successions, or where the succession is so much in debt that no one will accept the curatorship of it, has been found insufficient, and the act of 1826, page 438, sec. 7 of Martin's Digest, provides for the appointment of syndics.

That recurring to 1819–20, it might well be held under the decisions then in force, that the Court of Probates could

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.
not order syndics to be appointed, as it was without contentious jurisdiction for debt; and an insolvency involves every species of contention and litigation. That the Probate Court had not jurisdiction over claims for debts at that time, appears from the act of 1817, page 188, enumerating cases in which appeals were allowed in a special manner, and no appeal is given for a judgment for a debt, but only for judgments making certain orders, &c., and as the constitution provides, that appeals for matters in dispute over three hundred dollars, lies ultimately to Supreme Court, and no appeal for judgments for debts over three hundred dollars is provided from Probate Court to Supreme Court, such claims could only be sued in District Court, and that court rightly had jurisdiction in an insolvency which relates to debts.

That the matters in evidence show such a state of things, as fully warrants the exercise of jurisdiction, and the course pursued.

It is not a little singular to observe the coincidence of different systems of jurisprudence in different countries. Erskine says, "the word bankrupt is, in our law, sometimes applied to persons whose funds are not sufficient for their debts; and sometimes not to the debtor, but to his estate. There was no method known in our law, for the proper sale of a bankrupt estate, so as the price might be divided among the creditors, *title* 1681, *cap.* 17, by which the Court of Session was empowered, at the suit of any real creditor, to try the value of the debtor's estate, and name commissioners to sell it for the payment of his debts." This act was amended in 1690, and provides for debtors dying insolvent: the debtor or his apparent heir, and all the real creditors (viz: creditors by mortgage,) were according to the act, to be made parties to the suit; other creditors were to be called by edictal citation. He proceeds to lay down the mode of carrying through the suit. It was a statutory remedy, and commissioners are another name for syndics. The proceeding was in the Court of Session, which corresponded with, but was more extensive in jurisdiction than our District Court. The

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

case was considered as not provided for, although the Scotch law is based on the civil law.

There is some plausibility in the argument, that the Probate Court may be considered to have confirmed the appointment of syndics, by ordering the property to be delivered to them when applied to for that purpose.

3. That, according to the state of jurisprudence in Louisiana in 1819, an estate did not immediately descend to, and vest in the apparent heir on the death of the ancestor, but remained in suspense, both as to ownership and possession, until it was accepted; that no heir at that time was presumed either to accept or renounce; that the regular course would have been to call upon the mother, as tutrix, to accept or renounce, and if a renunciation was made and no person would offer as curator, I conceive an appointment of syndic by the District Court, would have been rightly made; but inasmuch as the law did not cast the succession on the heir, if the heir neither accepted or renounced, the succession was an abandoned one, and any legal course of administering it, and acts done in pursuance of such administration, would bind the title of the property.

That, in the present case, where Poultney was insolvent during his lifetime, and declared himself to be so; when the mother and tutrix, after deliberation, and aided and advised by friends and counsel, had renounced and abandoned rights equal to those of the children, and which renunciation was obviously understood and conceived by all parties to embrace and include a renunciation for the children; when she was apprised of the proceedings, executed the decree by delivering up the property and joining the syndics by powers of attorney to other states, to recover the property of the succession. All these facts and circumstances constitute such a state of things, that, in accordance with the North Carolina decision, a court or jury ought to presume a renunciation by the children of an insolvent succession, all the debts being then due, the respite having expired with him.

4. That, although the strictly regular mode of proceeding would have been to have cited the mother of the minors to

HARVARD LAW LIBRARY

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

accept or renounce the succession on their behalf, as she had decided for herself; and if the succession was accepted, then the mother could have been sued as tutrix, or compelled to give security, and the estate sold on decrees against her; if renounced, a curator or syndics, &c. could have been appointed to administer and distribute the succession among the creditors. But as equity may be administered in relation to the substance of any right, claim, contract, &c., I do not see why courts may not look into and through forms, to see if the substance intended by those forms was not complied with. It is assumed that Mrs. Poultney was tutrix of her minor children; that she had renounced for herself; that she was fully apprised and informed of these proceedings. This assumption and presumption is based on the fact, that the friends and counsel who had advised her to renounce, had provoked the insolvent proceedings. It was an event which could not take place without her knowedge. All Poultney's property which was in her possession, was surrendered by her, except the furniture, which remained in her possession by consent of the syndics, in executing powers of attorney to collect Poultney's estate, she must have had a perfect knowledge of, and sanctioned these proceedings.

If a party not cited executes the judgment, it is binding. *Code of Practice*, 612.

She had renounced for herself, and could only act for the minors. The syndics had her authority and approbation, and may be considered as her agents.

Presume an acceptance for the children, and the result, in my opinion, must have been the same.

I consider this a case in which the substance was performed, although strict forms were not followed.

As it seems a general practice, either from want of confidence in ourselves, or from indolence of mind, or a desire to show that the judgment is not made under the bias of any circumstances which might mislead the mind in the particular case to be judged, that the decisions of judges and courts must rest on the crutches of authority, rather than on arguments derived from reason, justice and propriety.

I quote the following authority from the decisions of the *Roman Rota*, as given at the end of *Paz Praxis*, *Dec.* 13. *No.* 7, 8 *and* 9. This decision is given in a case treating of *restitutio in integrum*, for want of citation and a curator to a minor :

No. 7. " *Auctoritas judicis supplet defectum citationis.*"

No. 8. " *Defectus curatoris nullitatem non paret ubi eo deputato sententia declinari non potuisset.*"

No. 9. " *In negotiis minorum non tam quomodo et quibus solemnitatibus, sed quid in substantia factum sit inquisitur.*"

I repeat an authority heretofore cited by me, from 2 Philimore, 224 : " The process of citing parties is a convenient one for all suitors, because when that is done, you need not actual privity, the law presumes actual privity after the legal process, the *lis pendens*, is sufficient notice that parties should appear and protect their own interest ; but if you can prove actual privity, the legal process in point of solid justice and sound reason is superfluous, though *exabundanti cautela*, it may still be convenient to resort to it, and have it upon record in another place."

"Spectators to the whole, and privity to the whole, if they had been dissatisfied, they might have intervened at any moment of the proceedings. This right of intervention coupled with privity to the proceedings, is decisive to show that they can have sustained no prejudice, by not having been before cited, and not having given a formal appearance." Again a defendant having notice of a decree to which he was no party, paid money contrary to that decree : ordered that he should pay the money over again. 2 *Chitty's Digest*, 154. Notice of a mortgage is equal to registry, and the many English cases where notice of the attorney, or rather knowledge in him, is notice to the party.

In my view of the facts of this case, for the reasons before assigned, I am satisfied as to the fact that Mrs. Poultney had full notice of these proceedings ; that she executed the decree by delivering up the estate to the syndics, and finally, that as tutrix she sanctioned all these proceedings, by joining them in executing powers of attorney.

EASTERN DIST.
June, 1835.

POULTNEY'S
HEIRS
vs.
BARRETT ET AL.

And if No. 8 of the decision cited is of any weight, and it has the full force of reason and justice with it, it is clear that nothing that she or the minors could have done, could have prevented the sale of the property in question.

There is also a strong parallel between the present case and that of Keene *vs.* M'Donough, 8 *Peters,* where the validity of the judgment was maintained, although no attorney was appointed in the original suit, to represent Keene, the absent defendant.

5. That the act of the city corporation in requiring the sale of the property in question, may properly be considered as an exercise of their right of entry and forfeiture, both for non-payment of rent and Poultney's failure. The motion is to sell the lot to satisfy the rent; Mr. Fleitas testifies rent was due : this is every way probable in the course of things. After Poultney's death no one had a direct interest to pay the rent; after the order is executed, the oath of the creditor is of no moment, if the rent was really due; it may have been proved at the time, and the syndic by his acts admitted it.

The motion was made on 21st December, 1822, after respite had expired, to sell on fifteen days' advertisement; it was sold on 15th January, 1823; if the proceedings were governed by analogy to the insolvent law, there was no law to require a longer advertisement.

I repeat, it may be considered as an entry and sale by the corporation under their right of entry and forfeiture, although they might wish to give the estate the benefit of any advance or additional value; and this being done, all was done that the most strict justice could require. I consider that the court is bound to support these judicial proceedings and decrees of the highest court of original jurisdiction, if by any reasonable intendment they can be supported; and the case appears to me parallel to that of Clark's heirs *vs.* Christ Church, and to be supported on the authority and reasoning of that case.

In 1818, the property was bought by Poultney for two thousand and fifty dollars. He estimates it on his *bilan* at three thousand dollars. It sold for two thousand seven

hundred dollars at auction, which may be considered its fair value.

It is no question how this money was applied: there was a mortgage in favor of Porter and Mrs. Depeyster for one thousand three hundred and sixty dollars; probably two hundred dollars of rent; and there are three orders to pay, A. L. Duncan five hundred dollars, John R. Grymes five hundred dollars, and N. Morse two hundred and fifty dollars, for professional services; all taken at the very time of this sale and which probably absorbed the proceeds.

· Be that as it may, the estate was insolvent: the corporation had a right of entry and forfeiture, and provoked the sale. The property was sold under the order of a court of high authority, obtained contradictorily with the recognised administrator of the estate and brought a fair price. No injustice was in reality done to these plaintiffs. The justice of the law is with the defendant, and the reare facts and law enough, in my opinion, in the case, to warrant a judgment in his favor. It is, therefore, considered, that there be judgment for the defendant, and that plaintiffs pay costs of suit.

*Grymes and J. Slidell*, for the plaintiffs.

*Peirce*, for the defendant.

*Preston*, for Deacon, called in warranty.

*Eustis*, for the corporation of New-Orleans.

*Bullard, J.*, delivered the opinion of the court.

This case turns mainly on the principles of law, settled in the case of the same *plaintiffs against Cecil's executor*, decided at the present term. See *ante, page* 321.

The lot of ground in controversy, was purchased by Poultney, of Porter and the representative of Depeyster, who had previously acquired it from the city of New-Orleans, on a ground rent. After the appointment of syndics, the corporation provoked the sale of it, for arrearages of rent, and it

*Marginal notes:*

Eastern Dist.
June, 1835.

POULTNEY'S
HEIRS
*vs.*
BARRETT ET AL.

Where a corporation alienated a lot of ground, subject to a ground rent of six per cent. per annum, on one thousand seven hundred and twenty-five dollars, payable quarterly, with condition that if two or more quarters remained unpaid, the alienor may enter and take possession: *Held, that when the*

EASTERN DIST.
*June*, 1835.

POULTNEY'S
HEIRS
*vs.*
BARRETT ET AL.

premises were transferred to a third possessor, who died without paying the arrearages of rent, a sale by the syndics of his creditors, provoked by the corporation, divested his title thereto, so that his heirs at law cannot recover.

When the right of entry stipulated for by the corporation became absolute, by arrearages of rent accruing, and non-compliance with the conditions, the purchasers and vendees are mere tenants at will, as the corporation had the right to enter at any time.

was purchased at sheriff's sale by W. Deacon, who conveyed to the defendant. Among the conditions of the sale to Porter and Depeyster, is the following: "*Et dans le cas où les acquéreurs viendraient à faire cession de biens à leurs créanciers ou en obtenir terme et délai, il est convenu que le vendeur en sa qualité ne sera pas alors censé lui avoir transféré la propriété du terrain par lui donné à rente perpétuelle par les présentes, en raison de ce qu'il n'en aurait pas reçu le prix capital. En conséquence, les dits acquéreurs ne seront considérés en ce cas que comme locataires ou fermiers ou possesseurs précaires de la chose, et la corporation de la Nouvelle-Orléans sera préférée sur ces terrains à tous les créanciers des acquéreurs quelqu'antérieurs ou privilégiés qu'ils soient, et sera habile à être réintégré comme ayant conservé le domaine réel des terrains.*"

Poultney purchased the lot, subject to the same conditions, and having obtained a respite from his creditors, in 1819, without paying the price, he became a mere tenant at will of the corporation, and the corporation had a right to enter. 4 *Louisiana Reports*, 286.

We are, therefore, of opinion, the title of Poultney was divested, and his heirs at law are not entitled to recover.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.